2001 ME 22

**MP ASSOCIATES et al.**

v.

**Michael LIBERTY et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 10, 2001.
Decided: Jan. 30, 2001.

U. Charles Remmel II (orally), Kelly, Remmel & Zimmerman, Portland, Paul F. Macri, William D. Robitzek, Berman & Simmons, P.A., Lewiston, for plaintiffs.

George J. Marcus (orally), Lee H. Bals, Regan M. Hornney, Marcus, Clegg & Mistretta, P.A., Portland, for defendants.

Panel: WATHEN, C.J., and RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

RUDMAN, J.

[¶ 1] Michael Liberty and David Cope (collectively referred to as "Liberty") appeal from a judgment entered in the Superior Court (Cumberland County, *Cole, J.*), finding them liable—in their capacities as general partners of Middle Pearl Associates—to Henry S. Payson, Daniel G. Hall, and James Kilbride for the $250,000 payment made by each to U.S. Trust Company and to Morse Payson & Noyes Insurance for its payment of $439,512.99 to Casco Northern Bank. Plaintiffs MP Associates, Henry S. Payson, James J. Kilbride, Daniel G. Hall, and Morse Payson & Noyes Insurance (collectively referred to as "Plaintiffs") appeal from that portion of the court's judgment denying MP Associates' reimbursement for the $439,512.99 it alleges it paid to Casco Northern Bank. We affirm the judgment in part and vacate in part.

## I. CASE HISTORY

[¶ 2] This matter arises out of a failed business venture. The parties stipulated to a set of facts in conjunction with their cross motions for a summary judgment in the Superior Court. The following facts are derived, in large part, from that factual stipulation.

[¶ 3] On September 9, 1986, MP Associates, a Maine general partnership, was formed to pursue a commercial real estate venture. Its general partners were Henry S. Payson, James J. Kilbride, William Webster, and Daniel G. Hall. The MP Associates partnership agreement was later amended to include Morse Payson & Noyes Insurance ("Morse Insurance") as a partner.

[¶ 4] On the same date, Middle Pearl Associates, a Maine limited partnership, was formed. Its general partners were David Cope, Michael Liberty, Webster, and David and Richard Cook.[1] The limited partners were Liberty, Cope, the Cooks, and MP Associates.

### A. U.S. Trust Loan.

[¶ 5] On March 30, 1987, U.S. Trust Company, a Massachusetts banking institution, lent $5,500,000 to Middle Pearl Associates to purchase a commercial office building located at 130 Middle Street in Portland, Maine. The U.S. Trust loan was secured by a mortgage and guarantied by Liberty, Cope, the Cooks, Webster, Payson, Hall, and Kilbride.

[¶ 6] In 1990, after falling behind on its U.S. Trust mortgage obligation, Middle Pearl Associates was forced to liquidate its only asset, the 130 Middle Street property, and to cease to operate. After the sale of the property, U.S. Trust made a demand upon Middle Pearl Associates and each of the guarantors of its loan for the deficiency in the amount of $1,790,838.54. Hall, Kilbride, and Payson negotiated with U.S. Trust on their guaranty liability on the deficiency, reaching a settlement in June 1991. In satisfaction of their obligation as guarantors, Hall, Kilbride, and Payson each made a $250,000 payment ($750,000 in total), and Morse Insurance issued a note in the amount of $250,000 to be satisfied from a rent deduction if obtained. The debt evidenced by the note that was due on December 31, 1992, has not been paid.

[¶ 7] In June 1991, Liberty and Cope settled their obligation as guarantors of the U.S. Trust debt by paying a total of $200,000 in cash and providing notes totalling $350,000. As part of the settlement, Liberty provided U.S. Trust with new security for the debt, including a collateral assignment of 30% of the capital stock of Liberty Group; an assignment of Liberty's limited partnership interest in Westbrook Associates; a second mortgage on the David Cope House (when and if the Cope real estate is transferred to Liberty or to an entity controlled by Liberty); and an assignment of Liberty's limited partnership interest in Stillwater Avenue Land Associates. The notes are currently outstanding, unpaid obligations, continuing to accrue interest. U.S. Trust continues to demand payment under these notes; there is no evidence that U.S. Trust has sought to recover on the collateral.

### B. Casco Northern Bank Loan.

[¶ 8] On September 9, 1986, Casco Northern Bank also lent Middle Pearl Associates $2,500,000 in connection with the 130 Middle Street Property. The Casco loan was secured by a second mortgage on the property and guarantied by Liberty, Cope, Morse Insurance, and MP Associates. After the 1990 liquidation of Middle Pearl Associates's commercial property, Casco demanded full payment of its loan, having a principal balance of $1,300,000. Casco applied a setoff of $426,828.99 from a Morse Insurance escrow account and a setoff of $339,763.04 from a Cook escrow account. After applying the setoffs, Casco made a demand upon each of the Casco-loan guarantors for the $533,387.97 deficiency.

[¶ 9] On January 1, 1991, Morse Insurance and MP Associates settled with Casco. Under the settlement, Morse Insurance and MP Associates agreed to pay an additional $452,177 in satisfaction of the Middle Pearl Associates deficiency.

[¶ 10] Casco then commenced negotiations with Liberty and Cope regarding

---

1. David Cook, Richard Cook, and William Webster are not involved in this action. The Cooks have been released by all the parties to this action and William Webster has been adjudged a bankrupt.

their guaranty obligations. After several workout agreements and amendments, Liberty and Cope, as guarantors, collectively paid at least $171,984.75 toward the Middle Pearl Associates deficiency to Casco in satisfaction of their obligations as guarantors on the Casco debt. The parties dispute the precise amount of the payments that were made by Liberty and Cope.

[¶ 11] After the January 8, 1998, trial management conference, the court entered a pre-trial scheduling order, which was later modified to extend, by one week, the due dates for filing the parties' motions for a summary judgment and reply memoranda. Pursuant to the order, the parties entered in the stipulation of facts and filed cross summary judgment motions. After some adjustments between Morse Insurance and MP Associates, the original factual stipulation indicated that each paid $439,512.99 to fulfill their guaranty obligations. On July 17, 1998, Liberty filed a motion to strike the provision of the stipulation stating that MP Associates had made a payment to Casco in satisfaction of its obligations as a guarantor. Liberty contended that while preparing the defendants' statement of material fact, it was discovered that the stipulated fact of MP Associates' payment was not consistent with the express terms of the settlement agreement with Casco. The trial court agreed and that portion of the stipulation was stricken. The plaintiffs contend that the trial court abused its discretion when it struck the stipulation. The trial court concluded that Liberty and Cope were liable—in their capacities as general partners of Middle Pearl Associates—to Payson,

Hall, and Kilbride for their payments each of $250,000 to U.S. Trust and liable to Morse Insurance for its payment of $439,512.99 to Casco. Liberty contends, that, (1) the plaintiffs agreed to defer their claims for reimbursement until Middle Pearl Associates's debts to both U.S. Trust and Casco were paid in full and that has not occurred; (2) Morse Insurance's claim is time barred; and (3) MP Associates did not make any payments and is not, therefore, entitled to reimbursement. This appeal and cross-appeal followed.

## II. DISCUSSION

 [¶ 12] In reviewing a grant of a summary judgment, we view the evidence in the light most favorable to the party against whom the judgment has been granted, and review the trial court's decision for errors of law. *Kandlis v. Huotari,* 678 A.2d 41, 42 (Me.1996) (citation omitted). We independently determine whether the record supports the conclusion that there is no genuine issue of material fact and that the prevailing party is entitled to judgment as a matter of law. *Id.* A material fact is one having the potential to affect the outcome of the suit. *Burdzel v. Sobus,* 2000 ME 84, ¶ 6, 750 A.2d 573, 575 (citation omitted). A genuine issue exists when sufficient evidence requires a factfinder to choose between competing versions of the truth at trial. *Id.*

### A. U.S. Trust Loan

 [¶ 13] Section 295–A of the Maine Partnership Act provides that all partners are jointly liable for all debts and obligations of the partnership. 31 M.R.S.A. § 295–A (1)(B) (Supp.2000).[2] This general

---

2. Section 295–A of the Maine Partnership Act provides, in pertinent part:

 **1. Partnership liability.** Except as provided in subsection 2, all partners are liable:

A. Jointly and severally for everything chargeable to the partnership under section 293 and 294; and

B. Jointly for all other debts and obligation of the partnership. Any partner may

principle of partnership law extends to general partners in a limited partnership. *See* 31 M.R.S.A. § 443(2) (1996).[3] Hence, Liberty and Cope, as general partners in Middle Pearl Associates, are jointly liable for all debts and obligations of that limited partnership.

■ [¶ 14] The general principle of suretyship law further requires that a secondary obligor is entitled to reimbursement from a primary obligor for performance of the secondary obligation. *See Godfrey v. Rice*, 59 Me. 308, 314 (1871) (holding an indorser of a note may recover of the maker for any payment made upon the note after its dishonor); *Matthews v. Matthews*, 128 Me. 495, 499, 148 A. 796 (1930) (finding one who furnishes collateral as an accommodation to secure a loan of another is a surety to the one accommodated; surety who is called upon to pay debt of principal debtor is entitled to compel debtor to exonerate him from liability); RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 22 (1996) (stating principal obligor has duty to reimburse secondary obligor).

■ [¶ 15] The determination of whether the general reimbursement rule is applicable in the present case requires an analysis of the U.S. Trust guaranties, which provide, in relevant part, that:

> The undersigned [Liberty, Cope, the Cooks, Webster, Payson, Hall, and Kilbride] shall not exercise any right of subrogation, reimbursement, indemnity, contribution, or the like (including any right to proceed against any collateral granted by the Borrower to the undersigned) against the Borrower or any person liable or obligated for or on the Liabilities unless and until all of the Liabilities have been satisfied in full.

The trial court concluded that Plaintiffs were secondary obligors entitled to reimbursement for the payments they made on the Middle Pearl Associates debt. Liberty first argues that the court erred in so finding because, pursuant to the guaranty, Plaintiffs Hall, Kilbride, and Payson expressly deferred their right to reimbursement until the U.S. Trust obligation has been fully satisfied.

[¶ 16] Liberty argues that, under *Kandlis v. Huotari*, 678 A.2d 41 (Me.1996), the deferral language of the guaranties, which were all signed at the same time and must be read together as a single contract, inures to Liberty's benefit as well. *See Kandlis v. Huotari*, 678 A.2d 41, 43 (Me. 1996). Liberty claims, therefore, that he is entitled to enforce the "deferral" provision against the plaintiffs, as co-sureties, thereby precluding plaintiffs from bringing this action. Liberty's assertions are flawed.

■ [¶ 17] Liberty's deferral argument fails because the guaranties at issue here have been superseded by separate settlement agreements and are no longer effective. By paying $250,000 each in cash and

---

enter into a separate obligation to perform a partnership contract.
31 M.R.S.A. § 295–A (Supp.2000).

**3.** Section 443 provides:

**1. Rights and powers.** Except as provided in this chapter or in the partnership agreement, a general partner but not a limited partner of a limited partnership has the rights and powers and is subject to the restrictions of a partner in a partnership without limited partners.

**2. Liabilities.** Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners. Except as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to the partnership and to the other partners.
31 M.R.S.A. § 443 (1996).

obtaining releases under the terms of the settlement agreement, the obligations of plaintiffs Hall, Kilbride, and Payson under the original guaranties have terminated. Similarly, having settled with U.S. Trust on the original debt by paying $200,000 in cash and executing notes—secured by certain Liberty collateral—totalling $350,000, Liberty's liability as a U.S. Trust loan guarantor has also terminated.[4]

[¶ 18] Because the promissory notes executed by Morse Insurance and by Liberty remain unpaid, however, Liberty contends the U.S. Trust debt has not been fully satisfied. He contends that Plaintiffs cannot, therefore, yet seek reimbursement. As we noted above, Liberty's argument fails, because under the facts of this case, the notes represent a new obligation with new remedies. At oral argument, Liberty's attorney also argued, pursuant to 11 M.R.S.A. § 3–1310(2),[5] that the underlying obligations were still active because the U.S. Trust notes have not been paid. *See* 11 M.R.S.A. § 3–1310(2) (1995). Because Liberty is making this latter argument for the first time on appeal, the issue has not been preserved. *See Sanders v. Sanders*, 1998 ME 100, ¶ 11, 711 A.2d 124, 127 (holding when there is no indication in the record that an issue was either raised, discussed, or ruled upon below, the point is not preserved).

[¶ 19] Even if the issue were preserved, Liberty's contentions lack merit because the relevant commercial code provision does not apply when the parties agree to a different result, which is the case here. *See* 11 M.R.S.A. § 3–1310. As noted above, the plaintiffs and Liberty each entered into settlement agreements, obtaining releases and/or providing additional collateral, which had the effect of terminating the original obligation. The trial court, therefore, did not err in concluding that plaintiffs Hall, Kilbride, and Payson were entitled to reimbursement.

[¶ 20] Liberty further contends—also relying on the *Kandlis* case—that plaintiffs' argument that they are entitled to reimbursement as "secondary" obligors is misplaced because, in this case, all the parties were equally liable to the banks under the guaranties as guarantors. *Kandlis*, however, is of no service to Liberty on this point. In *Kandlis*, the parties' relationship was uniform; they were all shareholders and guarantors of loans of the defaulting entity. *See Kandlis*, 678 A.2d at 42. In this case, Liberty and Cope wear two hats; they serve as general partners of Middle Pearl Associates and as guarantors of the Middle Pearl Associates' U.S. Trust loan. Plaintiffs, on the other hand, serve only as guarantors of the U.S. Trust loan. *Kandlis*, therefore is distin-

---

4. With respect to the Casco guaranty, Liberty also argues that Morse Insurance's reimbursement claims fail because the guaranty expressly states that such rights are deferred until Casco has been paid in full. Liberty's argument fails here for the same reasons stated in the discussion relating the U.S. Trust guaranty.

5. 11 M.R.S.A. § 3–1310(2) provides, in relevant part:

(2) Unless otherwise agreed and except as provided in subsection (1), if a note ... is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken and the following rules apply.

. . . .

(b) In the case of a note, suspension of the obligation continues until dishonor of the note or until it is paid. Payment of the note results in discharge of the obligation to the extent of the payment.

(c) Except as provided in paragraph (d), if the ... note is dishonored and the obligee of the obligation for which the instrument was taken is the person entitled to enforce the instrument, the obligee may enforce either the instrument or the obligation.

11 M.R.S.A. § 3–1310(2)(b) & (c) (1995).

guishable, and Liberty's assertion that all the parties are equally responsible for the loans, irrespective of the various levels of relationships at play here, is flawed.

[¶ 21] Because the plaintiffs only serve as guarantors of the Middle Pearl Associates debt, they are, as to the Middle Pearl Associates general partners, secondary obligors. Accordingly, Liberty and Cope, as general partners of Middle Pearl Associates, are primarily liable for all debts and obligations of the partnership, including the loans at issue. *See* 31 M.R.S.A. §§ 295-A (1)(B), 443(2). Because plaintiffs are not suing Liberty and Cope in their role as guarantors or co-sureties but in their role as general partners of a failed limited partnership, the trial court did not err in finding that plaintiffs are entitled to reimbursement.

## B. Casco Loan

[¶ 22] With respect to the Casco loan, Liberty contends that Morse Insurance's claim for reimbursement is barred by the statute of limitations and that the trial court did not exceed the bounds of its discretion by striking paragraph 15 of the factual stipulation.

### 1. Statute of Limitations.

[¶ 23] The trial court concluded that Morse Insurance's claim for reimbursement was not barred by 14 M.R.S.A. § 752. Section 752 provides that civil actions must be commenced "within 6 years after the cause of action accrues" but does not specify when the cause of action accrues. *See* M.R.S.A. § 752 (1980).[6] "When the Legislature does not give explicit directions, the 'definition of the time of accrual ... remains a judicial func-

tion.'" *Nevin v. Union Trust Co.*, 1999 ME 47, ¶ 24, 726 A.2d 694, 699 (quoting *Anderson v. Neal*, 428 A.2d 1189, 1191 (Me.1981)).

[¶ 24] In this case, the trial court held that a secondary obligor's action does not accrue until the date of the secondary obligor's performance of the secondary obligation. Accordingly, the court held that Morse Insurance did not perform its obligation until it was released by Casco in January 1991.

[¶ 25] In considering this issue, we adopt the approach taken by RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 62 (1996). Section 62 of the RESTATEMENT provides:

(1) A secondary obligor's cause of action against a principal obligor to enforce the principal obligor's duty to reimburse or the secondary obligor's right of restitution accrues at the later of:

(a) the date for performance of the underlying obligation; and

(b) the date of the secondary obligor's performance of the secondary obligation.

RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 62 (1996). The Restatement did not define the term "performance." BLACK'S LAW DICTIONARY, however, defines it as "[t]he successful completion of a contractual duty, usu[ally] resulting in the performer's release from any past or future liability." BLACK'S LAW DICTIONARY 1158 (7th ed.1999). In the present case, the successful completion of Morse Insurance's contractual duty occurred on January 1, 1991, when it satisfied its guaranty obligations to, and obtained a release from, Casco. Because the suit was brought on

---

6. Section 752 provides that:

All civil actions shall be commenced within 6 years after the cause of action accrues and not afterwards, except actions on a judgment or decree of any court of record of the United States, or of any state or of a justice of the peace in this State, and except as otherwise specially provided.

14 M.R.S.A. § 752 (1980).

December 3, 1996, Morse Insurance's claim for reimbursement is not time barred. This restatement rule allows a guarantor to work with the principal debtor in its effort to put its financial affairs in order by discouraging precipitous actions by the guarantor against the principal. The rule further relieves the court of the burden of repetitious litigation.

### 2. Motion to Strike.

[¶ 26] We review a motion to strike a stipulated fact for an abuse of discretion. *See Adelman v. Town of Baldwin*, 2000 ME 91, ¶ 6, 750 A.2d 577 (citing *McNutt v. Johansen*, 477 A.2d 738, 740 (Me.1984) (reviewing denial of motion to strike default judgment for abuse of discretion); *Michaud v. Steckino*, 390 A.2d 524, 531 (Me.1978) (reviewing denial of motion to strike testimony for abuse of discretion)).

[¶ 27] Liberty's motion to strike pertains to paragraph 15 of the factual stipulations that the parties executed in January 1998. Paragraph 15 provides, in full:

On or about January 1, 1991, Morse, Payson & Noyes Insurance and MP Associates agreed to settle with Casco on their guarantees of the Middle Pearl Associates deficiency. Under this settlement, Morse, Payson & Noyes Insurance and MP Associates agreed to pay an additional $452,177 against their guarantee liability of the Middle Pearl Associates deficiency. After adjustments between MP Associates and Morse, Payson & Noyes Insurance, each paid $439,512.99 on their obligations.

The relevant portion of the Casco settlement agreement referenced above provides as follows:

I. *REPRESENTATION, ACKNOWLEDGMENTS and AGREEMENTS.*

The Debtors hereby represent and acknowledge to and agree with Casco as follows:

1.1 *Existing Indebtedness.* The existing Loans are as follows:

. . . .

(b) *MPA Loan:* $2,500,000 note dated September 9, 1986, with a principal balance as of December 31, 1990 of $533,387.97. The MPA Loan is guaranteed by [Morse Insurance], as well as by MP Associates, a general partnership of which Henry S. Payson, James J. Kilbride, Daniel G. Hall and Maine XYZ, Inc. are general partners. At the request of the MPA partners, Casco has released its mortgage of the MPA property, to enable a sale of same, the proceeds of which were paid to the first mortgagee, there being no equity to reach the MPA Loan made by Casco. No other collateral is held by Casco for the MPA Loan. *At the request of the Debtors, Casco has agreed to the exclusion of Henry S. Payson, MP Associates, and Maine XYZ, Inc. from this Agreement and the other Loan Documents as Debtors, and the release of such parties from liability on the Indebtedness, as hereinafter defined.*

(Italics added for emphasis.) The trial court found that, as written, the settlement "clearly excludes MP Associates from the settlement." It concluded, therefore, that "[p]aragraph 15 is clearly a mistaken statement of the reality of the settlement agreement" and granted Defendants' motion to strike.

[¶ 28] In Maine, "[a] stipulation between litigants made under supervision of the court 'derives effect from the control of the court rather than from any virtue in the stipulation itself.'" *Rush v. County of Aroostook*, 447 A.2d 478, 479 (Me.1982) (quoting *Perley v. Bailey*, 89 N.H. 359,

360, 199 A. 570, 571 (1938)). Nevertheless, "[s]tipulations fairly entered into are favored" because they "expedite a trial and eliminate the necessity of much tedious proof." *T I Federal Credit Union v. Del-Bonis*, 72 F.3d 921, 928 (1st Cir.1995) (quoting *Burstein v. United States*, 232 F.2d 19, 23 (8th Cir.1956)). Once crafted, therefore, the parties are not generally free to extricate themselves from those stipulations at will. *Id.* (citing *Marshall v. Emersons Ltd.*, 593 F.2d 565, 569 (4th Cir.1979)). *See also* 73 Am.Jur.2d, Stipulation § 11 (1974) (stating "[i]t is generally considered that stipulations which tend to expedite the trial should be enforced unless good cause is shown to the contrary").

[¶ 29] A stipulation should be adhered to unless it becomes apparent that it may inflict a manifest injustice upon one of the contracting parties or where it becomes evident that "the agreement was made under a clear mistake." *T I Federal Credit Union*, 72 F.3d at 928 (quoting *Brast v. Winding Gulf Colliery Co.*, 94 F.2d 179, 180 (4th Cir.1938)). *See also United States v. Wingate*, 128 F.3d 1157, 1160 (7th Cir.1997) (holding "once made, a stipulation is binding unless relief from the stipulation is necessary to avoid 'manifest error' or the stipulation was entered into through inadvertence or based on an erroneous view of the facts or law"); *Yanovitch v. United States*, 985 F.Supp. 17, 19 (D.Mass.1997) (stating the First Circuit has indicated, in civil cases, that "[in] our judicial system, '[s]tipulations fairly entered into are favored,'" and once made, the parties are "not generally free to extricate themselves from those stipulations").

[¶ 30] Although a court may relieve a party from an improvident discovery stipulation or one that might work an injustice, "[t]he stage at which a party requests relief from a stipulation bears heavily on whether the court should grant the relief, and a court must determine whether there are overriding rules or policy considerations that compel granting or denying such relief." *Kirtley v. Sovereign Life Ins. Co. of California (In re Durability Inc.)*, 212 F.3d 551, 555–56 (10th Cir. 2000); *see also Carnegie Steel Co. v. Cambria Iron Co.*, 185 U.S. 403, 444, 22 S.Ct. 698, 714–15, 46 L.Ed. 968 (1902) (stating, "while the stipulation is undoubtedly admissible in evidence it ought not to be used as a pitfall, and where the facts subsequently developed show, with respect to a particular matter, that it was inadvertently signed, we think that, *upon giving notice in sufficient time to prevent prejudice to the opposite party,* counsel may repudiate any fact inadvertently incorporated therein") (emphasis added). For instance, "if a party waits until trial to withdraw stipulations submitted in the pretrial order, the recital of facts 'may be modified at the trial only to prevent manifest injustice.'" *Kirtley*, 212 F.3d at 556 (citation omitted). Moreover, relief may not be granted when it would be partial in nature, leaving the party against whom it was granted wholly or partially bound and at a disadvantage because of having changed his position or acted in reliance upon it. 73 Am.Jur.2d, Stipulation § 13 (citations omitted).

[¶ 31] In this case, Liberty's repudiation of the facts in paragraph 15 did not occur until July 17, 1998, well beyond the scheduling order delineated even by the modified consent order—dated February 12, 1998—and beyond the oral argument—held on July 10, 1998. Because of the tardiness of Liberty's motion to strike, MP Associates was prejudiced. For this reason and because the trial court's relief was only partial in nature, the court exceeded the bounds of its discretion in allowing Liberty to withdraw from part of its stipulation without giving MP Associates an opportunity to provide proof that it made the disputed payment. Had Liberty dissented earlier or been more careful examining documents he possessed for over a

year, MP Associates would have had an opportunity to respond.[7]

[¶ 32] Liberty's other contentions lack merit and do not warrant discussion.

The entry is:

Judgment affirmed in part and vacated in part; remand to Superior Court to grant MP Associates an opportunity to demonstrate that it made the payment indicated in paragraph 15 of the stipulation and for further proceedings consistent with the opinion herein.

7. MP Associates claims that the wording of the settlement agreement excluding it from the obligations therein was misinterpreted by Liberty. MP Associates argues that the exclusionary language was intended to exclude MP from that particular settlement agreement, not from paying its guaranty obligations altogether. MP contends that it had already separately paid to Morse Insurance (the other guarantor) its portion of the Casco liability, presumably to have Morse Insurance transfer the funds over to Casco once the settlement terms were reached. It was because of this that MP claims it was excluded from the obligations undertaken in the settlement agreement.